Thank you very much. We've reconvened with a slightly different panel. We have Judge Kodal from the District Court for the Southern District of New York, who graces our bench today, and we're grateful to him for his collaboration. And we'll hear counsel in Burwell against Peyton and Adams. Thank you, and good morning, Your Honors. May it please the Court, my name is Jim Carroll, and I'm here on behalf of Appellants Fred Peyton and Christina Adams. This, Your Honor, is an appeal that's taken from a motion for summary judgment that was filed in the District Court for the District of Vermont, and granted in part and denied in part. We are appealing the part of the decision that was denied by Judge Rice, and specifically, Your Honor, the issue involves the application of qualified immunity or immunity in connection with claims of excessive use of force, both under the Fourth Amendment and state claims that also basically involve the excessive use of force issues in the case. And, Your Honors, it's our position that, based on the facts, the undisputed facts that were, in fact, found and recited by the Court in its decision, that, in fact, the officers are entitled to qualified immunity on the excessive use of force claims, both pursuant to the state counts and the federal courts. Were you in the bathroom with Mr. Burwell for one minute before they pepper sprayed him? I'm sorry, Your Honor? I ask, as I understand the facts as found by the Court, they were in the bathroom with Mr. Burwell for one minute before they pepper sprayed him? Is that correct? Your Honors, I think the facts, the undisputed facts, demonstrate that, upon encountering Mr. Burwell, Is that one of the undisputed facts? there was, there, a minute is, I think, what the Court has found, and we're willing to the event itself, so that would be correct. Don't we have to assume that they had no reasonable basis to believe, when they confronted Mr. Burwell, that he was a burglar? He was sitting naked on the toilet seat. He was sweating, apparently comatose, no weapons about him, no apparent threat to the officers, and assuming the facts and the like most favorable to the plaintiff, they had been told by a neighbor that the resident had had medical problems in the very recent past, so look in the bedroom. Confronted with that, they had no reason to believe that that person they saw on the toilet seat was a burglar, right? Your Honor, I respectfully disagree based upon the undisputed facts that exist in connection with the suspicion of a burglar. Don't we have to construe the facts and the like most favorable to the plaintiff? And what burglars do you know that are found naked, sweating, comatose, in a home, no one else there, on a toilet, with no weapons? Your Honor, if one considers the other facts that are undisputed in connection with the officers and how they were called to the scene... But construing the facts and the like most favorable to the plaintiff, we know he was not a burglar, and construing the facts and the like most favorable to the plaintiff, why would not reasonable officers conclude, faced with those facts, that this was not a burglar? Your Honor, because there are other undisputed facts that were in the possession and knowledge of the officers on the scene, and at the time they responded to this particular call, which is when we have to, for the purposes... To a fact for the jury. Did they have a reason to believe that this person was a burglar? There were some reports that there was a burglar in the house. What they observed when they entered the bathroom didn't appear to be a burglar. Your Honor, I don't think that assumption can be fairly made based on the information that they possessed at the time that the confrontation occurred in the bedroom and at the bathroom. That's because of the information they possessed and knew at the time, which is uncontested in connection with a housekeeper who had appeared, gone in the residence, had called in a complaint to 911 of an unidentified individual within the residence. Also, that there were exigent circumstances under the circumstances, which is that there was smoke present in the place and that it looked ransacked. Those were components of information that were within the possession. Police differed in their testimony as to whether it looked ransacked or only messy. So we have to assume the facts and the light most favorable to the plaintiff that it didn't look ransacked, it looked messy. Your Honor, even if we assume that it looked messy to the officers as they were conducting a search of the residence based upon the complaint that had been phoned in or called, the report had come in that it was ransacked and as they're searching the place and as they're searching the place there's a fire alarm going off and there is smoke present in the residence and they have not been able to and do not have an identity of the individual that they confront in the bedroom. They do not know at that particular point in time that it is Mr. Burwell. Thank you very much, Your Honor. Well, that's important. He was sitting on the toilet, as Judge Codall mentioned. That's correct. And all the officers said he had something like a thousand yard stare. That's correct, Your Honor. Why was he a danger? Well, we have an individual who's sitting in the bedroom who is hearing commands from the officers to put your hands up, put your hands where we can see them. Sitting in the bathroom. Bathroom. Did I say bedroom again? Yes, you did. I apologize. Sitting in the bathroom. And we have a situation basically where the officers are issuing commands for the purposes of show your hands, see your hands, which they repeatedly did over the course of at least, I think the court counted, ten times without any response from Mr. Burwell. So we have a Why was, as Judge Pooler asked, why was he, why would a reasonable officer think that that person was a threat to them? He was naked with no apparent weapons, staring in a comatose way. Why does that appear to be a threat to the officers? Your Honor, because the other information they knew at the time, and it's undisputed that they knew it at the time, is that we're dealing with an individual who is unknown in this particular residence who has been phoned in as being someone who cannot be identified or associated with that residence by a housekeeper, and there's a fire. So what? They, construing the evidence in the light most favorable to the plaintiff, they had to deal with what they saw, what they confronted, and what they confronted was this naked, sweating, comatose person, no apparent threat, sitting on the toilet. Understood, Your Honor. And I think that information needs to go into the hopper with the other information that they possessed at that particular point. And who makes that decision once all the information goes into your hopper? Who decides what the facts were? Well, Your Honor, what I'm saying is based on the totality of those facts that are in the hopper at that particular point. A jury, perhaps, would then decide which of these facts are more compelling? I don't think given immunity and what is required in assessing immunity that there are facts for a jury to assess. If you take all of those facts and you put them all together with officers on the scene needing to make split-second decisions about how to deal with an unidentified individual in a residence with smoke and a fire alarm going off and information that had been provided to them that the place had been ransacked by the people who look after this particular residence. Objective information, right? All objective. It has to be objective. I agree, Your Honor. And objectively speaking, if you put all of that information together with these officers based on the moving and quickly evolving circumstances that they're presented with, objectively reasonable officers can differ in how they approach this particular situation and objectively reasonable officers can determine that we, at the very least, have a suspicious situation in front of us and perhaps we have an individual who is in need of aid or assistance. But all of this is happening very quickly and on the spot, and that's exactly what immunity is there to deal with. Thanks, Mr. Carroll. Thank you, Your Honor. And when you come back, we'll be interested in your addressing the doctrine of Malley against Briggs on qualified immunity and its most recent Supreme Court decisions as we're trying to figure out what's reasonable under the law of qualified immunity. Go ahead. Good morning, Your Honors. My name is Cristina Russo. I am here on behalf of Wayne Burwell sitting to my right. Your Honor, today I would like to address three issues. First, I'd like to talk about the notion that Judge Rice created a new legal doctrine where if the jury was to find that the officer's version of the events is not credible, there would be an automatic forfeiture of the qualified immunity. That is not our understanding and reading of the opinion by Judge Rice. The second issue I would like to address today is the issue of the clearly established right. In here, the basis for Mr. Burwell's claims, it is not just the handcuffing. It is all that happened before the handcuffing occurred. The third issue I would like to address, Your Honors, is the issue of the community caretaking doctrine and how the appellants cannot take advantage of this doctrine when they never intended to help Mr. Burwell. On the first issue, Your Honors, Judge Rice's opinion talks about the disconnect between the officer's own testimony and the other evidence that can be gleaned from the video and from the comments after this incident took place. They weren't wearing tape recorders on their uniforms, were they? No. There was one on Officer Adams and the video was only on the cruiser. So once they enter the home, you can hear what's happening. You can hear the dialogue. Yes, Your Honor. You can hear the dialogue and you can also hear the dialogue after these events take place. What Judge Rice is talking about in her opinion is that if a jury does not believe the officers, they could find that in this case a report came in that a man might be sick who might be the owner, that when the officers arrived at the residence, the neighbor came over and said to them, they found him sick two weeks ago. Check the bedroom. That when they opened the door- Who are that, Sergeant Moody? The first three officers, Your Honor, Sergeant Moody- Did you all hear it or just Sergeant Moody? The three officers were in the threshold of the door when Mr. McKag said, check the bedroom. They found him unconscious or- The defendants concede, don't they, that construing the evidence in the light most favorable to the plaintiff, the officers who went upstairs, Adams and Payton, knew that the neighbor had said that. Yes, Your Honor, and this is one of those disputed issues. They said that they did not hear it. So in Judge Rice's opinion, what she's saying, the sequence of the event can be, now they open the door, but they see no sign of criminal activity. That's undisputed. That when they open the door of the bathroom, they find a man in the same position that has been reported about 20 minutes earlier. He's in the toilet. He's naked. That when he posed no threat to the officer, he was threatened with deadly force. He was then pepper sprayed, beaten, and handcuffed in his own home. And if a jury was to find these facts to be true, then they would find that no reasonable officer could have thought that the use of force they used in this incident was reasonable, and therefore, qualified immunity would not apply. On the issue of the clearly established right, Your Honors, appellants attempt to narrow the issue to simply the handcuffing. They seem to ignore everything else that led to that handcuffing. The linchpin of their argument is the lower court dismissed Sergeant Moody, therefore, under the qualified immunity. Therefore, Officer Payton and Officer Adams should also be protected by the qualified immunity doctrine. They are not similarly situated, Your Honors. What Officer Moody did- He left the room, didn't he? I'm sorry, Your Honor? He left the room before- That's exactly correct, Your Honor. Once they approached the bathroom, Officer Moody left to go and tried to call the fire department because the call was not going out. So, Officer Moody was not present when Mr. Burwell was threatened with deadly force. He was not there when he was beaten. He was not there when he was pepper sprayed. When he came back to the residence, he came back with the news, he might be the homeowner and help put that second handcuff. What they did is very different. Officer Payton and Officer Adams are not in the same situation as was Officer Moody. What can you tell us about what these two remaining officers knew when they entered the plaintiff's residence? Or to put it another way, was there any basis for them to have known that Mr. Burwell was in a medical emergency? They should have thought about him being in a medical emergency. But they never even considered that he was in a medical emergency. They thought he was drug-induced, so they were not sympathetic toward his condition. Correct, correct. And during their depositions, they concede they never thought he was in the midst of a medical emergency. Let me ask you about that. So you've had a full course of depositions? We have, Your Honor. So if this were to go back to the district court on remand, there's no additional discovery? And you've had a—was the motion decided by Judge Rice a motion for summary judgment? It was, Your Honor, yes. All of the discovery has taken place. So now we have the conflicting testimony from the officers compared to what the audio shows and also with respect to some of the contemporaneous documents in the case. For example, the issue of the officers responding to a place that was ransacked or to a burglary. It is really not supported in the record, Your Honors. All of the contemporary— in the end, that the man in the bathroom was a possible burglar. That's why they were responding to begin with, right? That is the position that they have taken. But, Your Honor, I think the evidence— What's your position on that? That there was no evidence. Even if they thought that there was a crime being committed, if you give them the benefit of the doubt, there was no evidence that Mr. Burwell had committed any crime. But there was nothing in the home. There were no burglary tools. There was nothing that said burglary. What was reported was that there was a man who could be sick who may be the homeowner. When they noted in the records what they put is an unidentified individual, the first time this case became a burglary was when the town of Hartford issued the press release saying that the officers had responded to— What could it have been if not a suggestion of burglary or the belief that there might have been a burglary? That somebody was there in need of medical help, Your Honor. And that's what the evidence was telling them. And that is the evidence that this court must analyze this case under. It was the fact that the report comes in, he might be sick. It is the neighbor coming to the threshold and telling them, check the bedroom. It is the fact that in light of being threatened with deadly force, he's not responding. Everything should have led them to believe that they were dealing with a medical emergency. They were not dealing with a burglar. On the issue of this caretaking doctrine, Your Honors, appellants cannot take advantage of this doctrine, which first has traditionally been used as an exception to the warrant requirement. To get into the house. Correct. Yes, Your Honor. And that's why we have— That's the standard of excessive force once you're in under the community care doctrine. Under the community care doctrine, Your Honor, they can't take advantage of this doctrine if they never intended to help Mr. Burwell. The community care doctrine under CADI, the Supreme Court, it tells us it must be completely divorced from law enforcement purposes. But assuming, Your Honor— What do we know about their intent? What is it that leads you to say that they never intended to help Mr. Burwell? First, the evidence, the audio. The fact that they don't ask, who are you? What are you doing here? Their first response is, put your hands up, explicit remarks, or I'm going to shoot you. There was no intent to help him then. There was no intent to help him when they pepper spray him, knowing by their own admissions at that point he had no weapons. There was no intent to help him when they began beating him with a baton. There was no intent to help him when they handcuffed him in his own home. If they had an intent to help him, could they use excessive force to carry out their efforts to help? Under certain circumstances—I'm sorry, Your Honor. Could they use excessive force, or could they only use that force which is necessary to accomplish giving care? So you're faced with an unruly person that they have to take to the hospital. They can use that amount of force necessary to take the person to the hospital. Can they use excessive force even if they intend to help him? They can never use excessive force, Your Honor. It always has to be measured. That's by definition, right? Yes. If the force is excessive, it's not— It was a little much, but no, Your Honor. Certainly, if they went in there with the intent to help, and when they got in there, they realized he needed help, and he was not responsive, and they wanted to get him out to get him some help, and he refused, and they had to handcuff him, I don't think we would be here, Your Honor. But excessive force, even if their intent was to help, it is not allowed under the law, Your Honor. Thanks very much. Thank you, Your Honor. We'll hear from Mr. Carroll. Thank you, Your Honor. Your Honors, in connection with the discussion that was just underway about the community caretaking function, there is at the moment some uncertainty in connection with the law as it would apply in connection with people who are in the process of dealing with a caretaking function. And in the connection with immunity, the subjective intent of the officers under any circumstances when evaluating immunity is not really what's relevant in connection with it. It's the object of reasonableness of their actions and their activities. Community care doctrine only gets them in the house without a warrant. It's an exception to the rule that you need a warrant to enter somebody else's residence. So based on that, they get in. But that doesn't give them leave to use excessive force. Not excessive force, Your Honor, but it does give them leave to use force. Force necessary. Force necessary to deal with a specific situation. And that standard as to how to apply that. Everyone admits he was sort of comatose, right? And he's pepper sprayed? Is that the force that was necessary? That is the only force that was available at the time to get him to respond to the commands, the verbal commands that were repeatedly given to him for which he was not responding at all. At that, I'm sorry. So the string of expletives didn't work. It did not. It did not, Your Honor. Nor did the string of commands without expletives. Right. But that's the problem is that they're dealing with the situation, and they don't know if this particular individual at that point in time is an intruder, whether he belongs in the home, whether he is suffering from some sort of drug issue, has a health problem, or is in some other state. But one thing is for sure, and that is when the pepper spray was applied, he was able to get to his feet, and an altercation occurred at that particular point in time that resulted in his standing over Officer Adams during the altercation, a very precarious kind of a situation to be in, which is what resulted in the baton strikes. As soon as the officers heard from Officer Moody, who had exited the property at that point in time to seek assistance on his radio, that this individual may very well belong in this particular residence, I think the audio clearly demonstrates and shows, oh, now we have some certainty as to the situation. We need to get him out of here. Thanks very much, Mr. Chairman. Thank you, Your Honor. We'll reserve the decision, and we're in recess, and we will reconvene with the original panel in the matter of MPM silicones, et cetera.